UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA

     - against -

PIERRE RILEY,
    a/k/a "Adrean Francis,"
    a/k/a "Patee,"
MATTHEW CASAZZA,
    a/k/a "Estrada,"
LARRY BARRIS,
    a/k/a "Tony Panic,"
    a/k/a "Tom,"
ANTHONY PATTERSON,
    a/k/a "Rooster,"
GARFIELD THOMAS,
    a/k/a "Milo Man," and
RONNIE MAZIER
    a/k/a "Bruckey,"
    a/k/a "Robert Anthony Barnes,"

                Defendants.

------------------------------------X

**MEMORANDUM AND ORDER**

S1 06 Cr. 80 (NRB)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/7/08

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    The superseding Indictment ("S1 Indictment") in this
matter charged six defendants, Pierre Riley ("Riley"), Matthew
Casazza ("Casazza"), Larry Barris ("Barris"), Anthony Patterson
("Patterson"), Garfield Thomas ("Thomas"), and Ronnie Mazier
("Mazier"), with one count of conspiracy to distribute, or
possess with intent to distribute, marijuana in violation of 21
U.S.C. §§ 812, 841(a)(1), and 841(b)(A) ("Count One"), and one
count of possession of a firearm in furtherance of the

conspiracy alleged in Count One, in violation of 21 U.S.C. § 924(c) ("Count Two").[1]

On March 4, 2008, following a three-week jury trial, defendants Riley, Casazza, Barris, and Patterson were convicted on both counts of the Indictment and Mazier on Count One only.[2] The jury unanimously concluded, for each of these defendants, that the distribution, or possession with intent to distribute, of one thousand (1000) kilograms and more of marijuana was reasonably foreseeable given the scope of his jointly undertaken criminal activity.

This opinion addresses Riley, Casazza, and Barris's (the "moving defendants") post-trial motions for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) and, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33.[3]

---

[1]   The SI Indictment also names Bridgett Newland ("Newland"), Damion Elliot ("Elliot"), and Reggie Chin ("Chin") in Count One and Elliot and Chin in Count Two. Newland and Elliot pleaded guilty to superseding informations and cooperated with the government against their co-defendants. Chin remains at large.

[2]   Mazier was acquitted of the § 924(c) count. The jury was unable to reach a unanimous verdict on the conspiracy count against Thomas and, consequently, the Court declared a mistrial with respect to the charges against him. Subsequently, Thomas pleaded guilty to a superseding information.

[3]   Acting pro se, Mazier and Patterson filed letters dated April 6, 2008 and June 18, 2008, respectively, in which they seek leave to join their co-defendants' Rule 29 and 33 motions.
     Neither Mazier nor Patterson has adequately preserved his right to set aside the jury's verdict. Under the Federal Rules of Criminal Procedure, the time to file Rule 29 and 33 motions, or request an extension of the period in which to file such motions, expired on March 13, 2008. See Fed. R. Crim. P. 29(c)(1) ("A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later."); Fed. R. Crim. P. 33(b)(2) ("Any motion for a

For the reasons stated herein, the defendants' motions are denied.

## DISCUSSION

### I. Legal Standards

A defendant seeking a judgment of acquittal based upon the insufficiency of the evidence underlying his conviction bears a "heavy burden." United States v. Autori, 212 F.3d 105, 114 (2d Cir. 2000). "The Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999). Accordingly, a motion under Fed. R. Crim. P. 29(c) must be denied if "any rational trier of fact could have found the essential elements of the crime beyond a

_____

new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty."). Although this deadline was modified by the Court's order requiring notice of any post-trial motions within three weeks of the jury verdict, see Trial Transcript ("Tr.") 2582, this extended period also expired on March 25, 2008.

We believe, however, that Mazier and Patterson's late filings are excusable. See Fed. R. Crim. P. 45(b)(1)(B). At least some instances of inadvertence or negligent omission do not preclude relief under Fed. R. Crim. P. 45(b)(2)(B). Cf. Pioneer Inv. Svcs. Co. v. Brunswick Associates, 507 U.S. 380, 394-95 (1993) (expanding on the "excusable neglect" standard in various contexts). Here, because the filings were delayed by a matter of weeks and the government does not appear to have been prejudiced thereby, we exercise our equitable discretion to accept Mazier and Patterson's untimely submissions.

Nevertheless, as discussed in greater detail infra note 35, Mazier and Patterson's motions are denied for substantially the same reasons as those of their co-defendants.

reasonable doubt." Id. at 130. In evaluating the government's proof of guilt, the Court must view the evidence in the light most favorable to the government, see Autori, 212 F.3d at 114; Guadagna, 183 F.3d at 129, and must "credit[] every inference that the jury might have drawn in favor of the government." United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996).

Fed. R. Crim. P. 33 permits a convicted defendant to move for a new trial "in the interests of justice." "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). There must, of course, be "a real concern that an innocent person may have been convicted." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). Only in "exceptional circumstances," such as "where testimony is patently incredible or defies physical realities," may the trial judge "intrude upon the jury function of credibility assessment." Id. at 133-34.

## II.  Sufficiency of the Evidence to Sustain Count One

Based upon the evidence presented at trial, a rational juror readily could have found the moving defendants guilty of Count One of the S1 Indictment -- conspiracy to distribute, or possess with intent to distribute, 1000 kilograms of marijuana.

4

The essence of conspiracy "is an agreement to commit an unlawful act." Iannelli v. United States, 420 U.S. 770, 777 (1975). The agreement to commit an object crime, here, the distribution, or possession with intent to distribute a controlled substance, may "be inferred from the facts and circumstances of the case." Id. at 778 n.10. Once the existence of a conspiracy has been established, "evidence sufficient to link a defendant to it need not be overwhelming." United States v. Atehortva, 17 F.3d 546, 550 (2d Cir. 1994) (citations and internal quotation marks omitted). A defendant's knowledge and participation in a conspiracy with the requisite criminal intent may be demonstrated by circumstantial evidence. See, e.g., United States v. Villegas, 899 F.2d 1324, 1338-39 (2d Cir. 1990); see also United States v. Samaria, 239 F.3d 228, 234 (2d Cir. 2001). However, there must "be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." United States v. Nusraty, 867 F.2d 759, 763 (2d Cir. 1989) (citations and internal quotation marks omitted); United States v. Rodriguez, 392 F.3d 539, 545 (2d Cir. 2004).

The Second Circuit has held that, if the government seeks sentencing enhancements pursuant to 21 U.S.C. § 841, the drug type and quantity are treated as elements of the crime to "be

pleaded and proved to a jury or admitted by a defendant to support conviction or sentence." United States v. Gonzalez, 420 F.3d 111, 131 (2d Cir. 2005). Accordingly, the Government's burden of proof further "includes the requirement that a co-conspirator defendant at least could have reasonably foreseen the type and quantity of the substance about which he conspired." United States v. Thompson, --- F.3d ---, 2008 WL 2278141, at *6 (2d Cir. June 5, 2008) (quoting United States v. Adams, 448 F.3d 492, 500 (2d Cir. 2006)).

The moving defendants have not challenged the existence of a far-reaching and well-organized conspiracy, colloquially known as the John Shop Crew,[4] which trafficked in tons of marijuana in and around the Bronx, New York. The only issue presented is the sufficiency of the evidence offered in support of their knowing participation in the enterprise and the quantity of marijuana attributable to each moving defendant given the scope of his participation therein. In this regard, the government's case-in-chief relied principally on testimony from cooperating witnesses, Bridgett Newland ("Newland"), Damion Elliot ("Elliot"), Andrew Hibbert ("Hibbert"), and Denise Pinnock ("Pinnock"), and from a customer, Dave Williams, who frequently purchased marijuana from the John Shop Crew in 2002. The

---

[4] See, e.g., Tr. 312.

Mirandized, post-arrest statements of Casazza, Riley, and Barris were also introduced into evidence through the Drug Enforcement Agency ("DEA") agents who effected their arrests.[5]

The cooperating witnesses identified the moving defendants as core members of the John Shop and detailed their respective roles within the organization. Hibbert explained how several of his co-conspirators, mostly the principals of the John Shop, would pool their money to purchase substantial quantities of marijuana from their wholesale supplier in California. Casazza,[6] Riley,[7] and Barris[8] were responsible for unloading and unpacking the weekly shipments arriving at the John Shop's various stash houses in the Bronx. The shipments were then allocated in proportion to the investment of each contributing member, who would be responsible for selling his or her respective share.

---

[5]    Government's Opposition Brief ("G. Opp.") at 2-15.

[6]    Tr. 1159-61, 1212, 1546, 1580-82, 1591-93; see also Matthew Casazza Letter Brief ("Casazza Br.") at 4-5 ("Denise Pinnock testified that Estrada unloaded the van 'once or twice,' in early 2000 . . . . His role, she said, was to unpack and sell marijuana. . . . Andrew Hibbert testified that Estrada would help unpack the marijuana. . . . Hibbert further testified that Estrada helped unpack the marijuana" at the other John Shop stash houses, including 213 Street, Holland Avenue, and Barnes Avenue).

[7]    Tr. 1215-16, 1580-82, 1590-91, 1595-96, 1600; see also Pierre Riley Letter Brief ("Riley Br.") at 6-8 (citing Pinnock testimony that Riley "unpacks weed" and noting that "Hibbert claims that he sees [Riley] 'every day' and that he personally oversees [Riley's] involvement in the marijuana business.").

[8]    Tr. 324, 671-72, 1213-14, 1551-52, 1557; see also Larry Barris Letter Brief ("Barris Br.") at 4 ("Newland and Pinnock next alleged that following Pinnock's move to 2911 Tenbroeck Avenue during the summer of 2001 Barris assisted in the unloading of marijuana that was delivered to that location and continued to do so until the arrest of Dwayne John on June 2, 2004.").

Casazza,[9] Riley,[10] and Barris[11] would not only sell marijuana on behalf of other, more senior members of the organization but also, on occasion, contribute to the pool to purchase their own portions of the incoming shipment. During the 2001 to 2004 timeframe, each shipment contained between 500 and 900 pounds of marijuana.[12]

Casazza and Riley were also implicated in the transportation of marijuana from the John Shop's supplier in California. In the early days of the enterprise, couriers were often hired to smuggle cash aboard commercial flights bound for California and, once payment had been effected, the supplier would ship the John Shop's marijuana to the Bronx.[13] As a consequence of the heightened airport security measures in effect after September 11, 2001,[14] the John Shop began chartering a tour bus which would shuttle between the two coasts, carrying somewhere between $200,000 and $300,000 in cash, or its equivalent, 600 and 900 pounds of marijuana.[15] The cooperating

---

[9]    Tr. 237-38, 244-45, 315-18, 743, 1212, 1557, 1569, 1571, 1593-94.

[10]    Tr. 248, 331-32, 743-44, 1215, 1571.

[11]    Tr. 742-43, 1214, 1551-52, 1557, 1571, 1593.

[12]    Tr. 199, 208, 229-232, 267-68; see also Tr. 1196-1201, 1563-65, 1580, 1585, 1591, 1608.

[13]    Tr. 1602.

[14]    Tr. 244-48, 1602.

[15]    Tr. 317. The John Shop Crew purchased marijuana in California for $200-325 per pound. Tr. 182, 1181, 1572.

witnesses testified that Casazza[16] and Riley[17] traveled to and from California aboard the John Shop's chartered bus, which, given the other indicia of their involvement in the conspiracy, lends credence to the inference that their presence was intended to ensure the safe passage of the John Shop's capital.

Given the overwhelming evidence of the moving defendants' participation in the various aspects of the John Shop, the jury had an ample basis to infer their agreement to carry out the unlawful objectives of the conspiracy. As to the jury's determination of the quantity of marijuana for which the moving defendants should be held responsible, the record evidence plainly supports a finding that Casazza, Riley, and Barris were directly involved in the narcotics conspiracy and, based upon the scope of their participation, could have reasonably foreseen the distribution of 1000 kilograms of marijuana.

---

[16]    Tr. 247-48, 315-16, 768-70, 1602-03; see also Casazza Br. at 4-5 ("Newland testified that Matthew Casazza – also known as Estrada – [was] sent . . . to California with money . . . . Elliot also testified about Estrada 'beefing,' that is having an argument with Irky about bringing his, Estrada's girlfriend on the bus. . . . Hibbert testified that Estrada took the bus which brought money to California.").

[17]    Tr. 248, 331-32, 768-770, 1215; see also Riley Br. at (citing to portions of Newland and Pinnock's testimony concerning Riley's travel to and from California on the bus and noting that "Elliot . . . claims he once heard a story about some incident on a bus with Estrada and [Riley].").

## III. Sufficiency of the Evidence to Sustain Count Two

We also reject Casazza, Riley, and Barris's contention that the evidence was insufficient to sustain their convictions for possession of a firearm in furtherance of the marijuana conspiracy charged in Count One.[18]

### A.    Possession of a Firearm.

The concept "possession" encompasses both actual and constructive possession of a firearm. See United States v. Herrera, 446 F.3d 283, 287 (2d Cir. 2006). Actual possession is established by evidence that the defendant physically possessed the firearm, even if for a brief moment. See, e.g., United States v. Gaines, 295 F.3d 293, 300 (2d Cir. 2002) (holding that, in § 922(g)(1) context, possession element sufficiently established if defendant "reaches into the box, handles the guns one at a time, and briefly inspects each of them."). Constructive possession entails "showing that the defendant knowingly had the power and the intention at a given time to exercise dominion and control over an object." United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001). It is axiomatic that the unlawful possession, whether actual or constructive, "may be

---

[18]    As we noted supra note 2, Mazier was acquitted of this count of the Indictment.

10

sole or joint." United States v. Dhinsa, 243 F.3d 635, 676-77 (2d Cir. 2001).

There is no dispute that various members of the John Shop routinely carried and stored illegal firearms at their stash houses across the Bronx.[19] The cooperating witnesses described how the firearms were jointly possessed and treated as, essentially, communal property. Each John Shop member present at a particular stash house had unfettered access to and, indeed, frequently carried, the firearm(s) at that location.[20] For example, Elliot testified that "as long as we there, we, all of us, we hold those guns," so "if I go there, and it's Rooster or Tom there, one of them will give me the access [sic] to hold it"; "[o]nce I'm in the house and I have access to it, I'll get it."[21] Likewise, Hibbert explained that, if he was carrying one of the stash house handguns, he would hand "it to any one of those guys up there" before assisting a customer with a sale or leaving the stash house in the care of his co-conspirators.[22]

Evidence of the moving defendants' actual possession of firearms consists primarily of cooperator testimony that

---

[19]     Tr. 1468, 1929-30, 761-62, 1594, 1600.

[20]     Tr. 312, 761-62, 1575-77, 1581-82, 1594.

[21]     Tr. 761-62.

[22]     Tr. 1576-77, 1581-82.

Casazza,[23] Barris,[24] and Riley[25] were among the many co-conspirators who carried a handgun at one or more of the John Shop's stash houses. Two other instances of actual possession were offered by the government. Barris provided Hibbert with a .357 Desert Eagle to replace a stash house weapon that had been seized during a police raid in 2002.[26] Also, Casazza and Elliot were arrested for felony possession of a loaded firearm on July 24 2002. Although Casazza initially disclaimed possession during post-arrest interrogation, thereby implicating Elliot, he subsequently pleaded guilty to the charge after Patterson told him to "own" the weapon.[27]

We have no difficulty concluding that a rational juror could also have determined that Casazza, Barris, and Riley had constructive possession of the stash house handguns because they exercised dominion and control over the premises as well as the handguns themselves. Witness testimony sufficiently established the moving defendants' proximity and access to the weapons at

---

[23]    Tr. 710, 744-46, 761-62, 1467-69, 1575-77, 1582.

[24]    Tr. 324-25, 710, 744-46, 761-63, 1203-04, 1214, 1467-69, 1575-77. Elliot specifically testified that, in 2001 and 2002, Barris was in possession of two handguns - a 45mm and a 9mm - located at the Cruger Avenue stash house. Tr. 744-46, 761-63. Barris owned a third handgun, a .357 Desert Eagle, which he also kept at Cruger until 2002. Tr. 1203-04, 1597-1600.

[25]    Tr. 332, 710, 1467-69, 1575-77, 1582, 1592, 1594, 1600.

[26]    Tr. 203-04, 710, 762-63, 1203-04, 1214, 1597-1600.

[27]    Tr. 323, 507-08, 771-76, 1929.

the Cruger Avenue and other stash houses and also supported inferences of their knowledge of the weapons' existence and of their illicit motive for possession. See, e.g., United States v. Booker, 436 F.3d 238, 280 (D.C. Cir. 2006) ("[E]vidence of some other factor - including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise - coupled with proximity may suffice" to establish constructive possession). Moreover, the duration and extent of Casazza, Barris, and Riley's involvement in the John Shop conspiracy is indicative of their considerable control over the residences where the firearms were present. See, e.g., Finley, 245 F.3d at 203 (noting that "conducting a drug dealing business" from inside a house justifies an inference of dominion and control over the premises); Herrera, 446 F.3d at 288 (noting that joint responsibility for stash houses is probative of constructive possession of firearms present); see also United States v. Thompson, 473 F.3d 1137, 1143-44 (11th Cir. 2006); United States v. Maldonado-Garcia, 446 F.3d 227, 231 (1st Cir. 2006) ("[C]onstructive possession of a firearm may be established by showing that the person knows (or has reason to know) that the firearm is within easy reach, so that he can take actual possession of it virtually at will.").

Accordingly, we conclude that the jury's verdict on the possession element of the § 924(c)(1) count was amply supported by the evidence adduced at trial.

## B.    "In Furtherance" of a Drug Trafficking Crime.

The requirement of § 924(c)(1) that the firearm be possessed "in furtherance" of a drug crime is not satisfied by evidence that a firearm was merely present at the scene of a drug crime.  See United States v. Snow, 462 F.3d 55, 62 (2d Cir. 2006).  Instead, the government must establish the existence of a specific "nexus" between the possession of the firearm and the charged drug selling operation.  See id.; Finley, 245 F.3d at 203.  The ultimate question is whether the firearm "afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking."  United States v. Lewter, 402 F.3d 319, 321 (2d Cir. 2005).[28] Accordingly, courts "distinguish between a gun on the premises which has no reasonable relationship to the drug possession and future distribution" and a weapon that furthers that possession,

------

[28]    This is undoubtedly "a very fact-intensive question requiring a careful examination of, among other things, where the gun was located and what else was found" in the residence, and thus well-suited to resolution by a jury. Id. (quoting United States v. Taylor, 18 F.3d 55, 58 (2d Cir. 1994)).  Other factors for the jury to consider include:  the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.  See Snow, 462 F.3d at 62 n.6.

14

such as by protecting "drugs, drug proceeds, or the drug dealer himself." Snow, 462 F.3d at 62 (citing cases). The Second Circuit has repeatedly noted that "[p]ossession of a firearm to defend a drug stash clearly furthers the crime of possession with intent to distribute the contents of that stash." Lewter, 402 F.3d at 322; United States v. Thompson, --- F.3d ---, 2008 WL 2278141, at *6 (2d Cir. June 5, 2008) (quoting Lewter).

The jury could have readily inferred that the defendants' possession of firearms was intended to advance the objectives of that conspiracy. The government's cooperators testified that the purpose of carrying and possessing a firearm within the vicinity of a known stash house was to secure the marijuana and cash proceeds from sales at that location.[29] In this vein, Newland readily admitted that "they had a lot of enemies in the Bronx, and being that they always dealt marijuana, they have to have a gun just in case robbers will [sic] come."[30] Elliot reiterated this concern when he noted that the firearms were necessary "[b]ecause we dealing [sic] with drugs and the money, so we got to protect the drugs and the money."[31] From this testimony, as well as the proximity of the illegal handguns to

---

[29]    Tr. 311, 668, 761, 1159, 1575-77, 1581-82.

[30]    Tr. 668. Newland was, in fact, robbed at gun point of $146,000 in drug sale proceeds by individuals posing as law enforcement officials. Tr. 311-13.

[31]    Tr. 761.

15

the drug profits, packaged drugs,[32] and drug paraphernalia, such as scales and wrapping materials, a juror could have reasonably concluded that the moving defendants possessed illegal firearms at the stash houses to prevent and defend against a raid on the premises.   Cf. Snow, 462 F.3d at 63 (holding that "in furtherance" element established where "loaded handguns, illegally possessed, were found in the bedroom of an apartment where drugs were packaged and stored for sale").[33]

The circumstances surrounding Barris's ownership of a Desert Eagle and Casazza's felony conviction for possession of a loaded firearm independently support the jury's verdict on the § 924(c) count against those two defendants.   As discussed supra Section III.A, Barris knowingly provided the Desert Eagle to a co-conspirator for the purpose of protecting a stash house,[34] and

---

[32]    See, e.g., Tr. 1552-54, 1584-85.

[33]    Riley and Barris contend that their possession of firearms at Cruger Avenue after 2001 could not have furthered the ends of the conspiracy because the delivery of large-scale marijuana shipments to Cruger Avenue ceased in late 2000.   As the government correctly points out, several witnesses testified that Cruger was still being used as a point of sale even though shipments from California were not being directed there in the first instance.   Tr. 294-95, 744-45, 1008-10, 1012-13, 1575-1577.   Smaller quantities of marijuana, ranging from 50 to 100 pounds, were sold from Cruger and occasionally stored in a backyard shed built specifically for that purpose.   Tr. 1575-1577.   Accordingly, the jury could have found that the Cruger Avenue weapons were always being carried and possessed in furtherance of the conspiracy.

[34]    We are unpersuaded by Barris's argument that the evidence was insufficient to establish his knowledge of Hibbert's intended purpose for the Desert Eagle.   As discussed supra note 24, Barris's Desert Eagle was being kept at the Cruger stash house.   Pinnock testified that Dwayne John, the namesake of the John Shop Crew, was involved in the decision to move the handgun from the Cruger Avenue stash house to Hibbert's residence at Holland Avenue, in 2002.   From these facts, as well as others indicative of Barris's

16

Patterson ordered Casazza to plead guilty and exculpate a co-conspirator of the charges stemming from their arrest for possession of a firearm. These details give rise to a permissible inference that the firearms were not merely present or innocently possessed but that the defendants' possession was reasonably related to the goals of the drug conspiracy.

## III. "Interest of Justice" Review Pursuant to Rule 33

Having considered the totality of the evidence presented at trial and the defendants' submissions on the issue, we see no basis for relief under Rule 33. Accordingly, the motion for a new trial is denied.[35]

---

overall participation in the conspiracy, the jury could have easily determined that Barris knew the Desert Eagle would be carried and possessed in furtherance of the underlying conspiracy.

The transfer of the Desert Eagle to a second stash house, at the behest of the John Shop's de facto leader, reinforces the conclusion that Barris's initial possession was far from innocent and also supplies the requisite evidentiary basis for aiding and abetting a violation of § 924(c), see United States v. Persico, 164 F.3d 796, 802-03 (2d Cir. 1999).

[35] While we have not had the benefit of any briefing on Mazier and Patterson's requests to set aside the jury's verdict, see supra note 3, our independent review of the record suggests that their motions are properly denied as well.

After the arrests of several senior members of the John Shop, Patterson became a leader in the organization and began managing the transportation and distribution of ton-quantities of marijuana. See, e.g., Tr. 291-97, 300-03, 1006-13, 1207-09, 1562-63, 1567-68, 1582, 1603, 1609. Mazier handled many of the day-to-day tasks for Patterson, and like the other defendants, participated in unloading and unpacking the marijuana as well as selling it on behalf of Patterson and other co-conspirators. See, e.g., Tr. 313-15, 1161, 1209-10, 1570-71, 1580-81, 1584, 1593-94, 1610, 1613, 2013. The jury's verdict on the § 924(c) against Patterson was supported by the testimony of several cooperating witnesses who attested to the fact that, while residing at the Cruger Avenue stash house in 2001 and 2002, Patterson carried firearms to protect the John Shop's drugs and sale proceeds at that location. See, e.g., Tr. 312-13, 744-46, 761-62, 1207-09, 1575-77.

## CONCLUSION

For the foregoing reasons, the defendants' motions for judgment of acquittal and, in the alternative, for a new trial are DENIED.

Dated:    New York, New York
           July 3, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been
mailed to:

John Zach, Esq.
Julian Moore, Esq.
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

Kenneth A. Paul, Esq.
666 Third Ave., Suite 1200
New York, NY 10017

Mitchell Dinnerstein, Esq.
350 Broadway, Suite 700
New York, NY 10013

Alan Nelson, Esq.
3000 Marcus Avenue, Suite 105
Lake Success, NY 11042

Avrom Robin, Esq,
Ira D. London, Esq.
245 5th Avenue, Suite 1900
New York, NY 10016

JaneAnne Murray, Esq.
233 Broadway, 22nd Floor
New York, NY 10279

Kelley J. Sharkey, Esq.
26 Court Street, Suite 2805
Brooklyn, NY 11242

Jeffrey Lichtman, Esq.
750 Lexington Avenue, 15th Floor
New York, NY 10022

Donald Duboulay, Esq.
401 Broadway, 25th Floor
New York, NY 10013

Howard Jacobs, Esq.
401 Broadway
New York, NY 10013